**UNITED STATES of America, Plaintiff,**

v.

**Lawrence KELCOURSE d/b/a Larry's Marina, Defendant.**

**Civ. A. No. 88-1608-Y.**

United States District Court,
D. Massachusetts.

Sept. 25, 1989.

Andrew S. Hogeland, Asst. U.S. Atty., Boston, Mass., for plaintiff.

Mark Stull, Gordon N. Schultz, Schultz & Bednarz, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The United States Department of Justice ("Justice"), at the request of the United States Army Corps of Engineers (the "Corps"), brought this civil action against the defendant Lawrence Kelcourse d/b/a Larry's Marina ("Kelcourse"). Justice, on behalf of the United States of America, seeks injunctive relief and civil penalties for the alleged "unlawful placement of structures and fill material in the Merrimack River in violation of section 10 of the Rivers and Harbors Appropriation Act of 1899 ("Rivers Act"), 33 U.S.C. sec. 403, and section 301(a) of the Federal Water Pollution Control Act ("Water Pollution Act"), 33 U.S.C. 1311(a)."[1] Complaint at 1.

Kelcourse moves for partial summary judgment on the ground that the Court lacks subject matter jurisdiction to hear the United States' claim for civil penalties under the Water Pollution Act, as such claim is beyond the statutory enforcement authority of both the Corps and Justice. The gravamen of Kelcourse's argument is that Justice cannot bring this suit on behalf of the Corps because the Corps has[2] no statu-

---

1. The Water Pollution Act is also commonly referred to as the Clean Water Act. This name derives from the Clean Water Act of 1977 which amended the Water Pollution Act. H.R.Conf. Rep. No. 830, 95th Cong., 1st Sess. 1 (1977), U.S.Code Cong. & Admin. News 1977, p. 4326.

2. It is unclear whether the word "Corps" is singular or plural. *Compare* the definition in the American Heritage Dictionary, 2d College ed. (1985) (plural) *with* that in the Oxford English Dictionary (1980) (giving examples of singular usage). This Court adopts the singular form followed by one of America's most distinguished Army Engineers. *See The Wartime Papers of*

tory authority under any section of the Act to seek civil penalties for permitless discharges. Kelcourse argues that while the Corps, through the Secretary of the Army ("Secretary"), has authority under 33 U.S.C. sec. 1344 to issue and enforce permits, it has no authority to sue for civil penalties where no permit has been issued. Rather, he argues, the authority to investigate and enforce alleged violations of the Water Pollution Act that occur as a result of a permitless discharge lies squarely with the Administrator of the Environmental Protection Agency ("EPA"). Kelcourse further argues that Justice cannot bring this suit on its own initiative because there is no specific statutory authority for doing so, and its general authority to sue in the public interest, 28 U.S.C. sec. 516, is trumped by the express remedies Congress set out in the Water Pollution Act. While Kelcourse' arguments are far from frivolous, this Court rules that at the Corps' behest, the Justice Department can bring suit for civil penalties as a result of an alleged permitless discharge, and therefore Kelcourse's Motion for Partial Summary Judgment is DENIED.

The parties in this case raise two questions. First, does the Corps have authority to investigate matters involving permitless discharges and to refer such matters to Justice for enforcement proceedings? Second, did Congress intend Justice to bring actions under the Water Pollution Act on its own initiative without investigation and referral from an agency with expertise in the area? Because the Court answers the first question affirmatively, the second question is not properly before the Court and no opinion is expressed thereon.[3]

██ It is clear from a strict reading of 33 U.S.C. sec. 1344 that the Corps, through the Secretary of the Army, can bring an action for a violation of any condition or limitation in an issued permit. However, nowhere in the statute is it explicit that the Secretary can bring an action under 33 U.S.C. sec. 1344 for a permitless discharge.[4]

*R.E. Lee* 449 (C. Dowdey & L. Manarin, eds. 1961) (reproducing a letter to General J.E.B. Stuart dated May 1, 1863 in which Lee states "[t]his is Meade's Corps with which we are now engaged").

**3.** Indeed, the second question presupposes a scenario that is not present in this case, *viz.,* Justice initiating enforcement proceedings on its own. It seems from the facts that the Corps investigated and referred this case to Justice using the criteria set forth in the regulations and Memoranda of Agreement that govern these discharges. This is not a situation where Justice, on its own, without any regard for the mandated procedures, got a tip and prosecuted an alleged violation without so much as an investigation. Therefore, that question, although interesting, is not squarely before the Court. This Court makes no determination as to whether, in that case, Justice would have to follow any specified procedures. It notes that as a practical matter, however, it appears that most if not all of these cases are referred from an agency with expertise in the area. Therefore, denying this motion on the ground that Justice's plenary power under 28 U.S.C. sec. 516 allows it to initiate and prosecute these actions seems not only to ignore the facts but also to skirt what, as a practical matter, is the real issue.

**4.** 33 U.S.C. sec. 1344(a) states in pertinent part:
**Permits for dredged or fill material**
**(a) Discharge into navigable waters at specified disposal sites**

The Secretary [of the Army] may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites....
33 U.S.C. sec. 1344(f)(2) states:
Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced shall be required to have a permit under this section.
33 U.S.C. sec. 1344(s)(1) states:
*Violation of Permits*
Whenever on the basis of any information available to him the Secretary finds that any person is in violation of any condition or limitation set forth in a permit issued by the Secretary under this section, the Secretary shall issue an order requiring such person to comply with such condition or limitation, or the Secretary shall bring a civil action in accordance with paragraph (3) of this subsection.
33 U.S.C. sec. 1344(s)(3) states in pertinent part:
The Secretary is authorized to commence a civil action for appropriate relief including a permanent or temporary injunction for any violation for which he is authorized to issue a compliance order under paragraph (1) of this subsection.

Despite this fact, it seems that the Corps has been referring permitless discharge cases to Justice for quite some time. Although the cases are brought in the name of the United States and not the Corps, it seems clear from the text of the opinions that the Corps has been involved in investigating cases against permitless dischargers and referring such cases to Justice for enforcement. *See United States v. Tull,* 769 F.2d 182, 189 (4th Cir.1985) (Warriner, J., dissenting) ("the Corps of Engineers in the name of the United States, filed this action" under 33 U.S.C. secs. 1311 and 1344, and obtained damages under 33 U.S.C. sec. 1319) *rev'd on other grounds,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *United States v. Cumberland Farms of Connecticut, Inc.,* 826 F.2d 1151, 1163 (1st Cir.1987) ("[The] regulations ... clearly set out the Corps' enforcement policy that in exceptional circumstances, *i.e.,* knowing, flagrant, repeated or substantial impact violations of the Clean Water Act, the Corps shall seek civil penalties ..."), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988); *United States v. Larkins,* 657 F.Supp. 76 (W.D.Ky.1987) (Corps through Justice brought suit alleging a violation of 33 U.S.C. secs. 1311 & 1344 and obtained a section 1319 penalty, injunctive relief, and restoration of the site for section 1311 violations), *aff'd,* 852 F.2d 189 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1131, 103 L.Ed.2d 193 (1989); *Parkview Corp. v. Dep't of the Army, Corps of Engineers,* 490 F.Supp. 1278 (E.D.Wis.1980) (holding that the regulations giving the Corps authority to issue cease and desist orders with respect to filling in absence of a permit and to order removal of fill placed in the absence of a permit were reasonably related to the Corps' statutory permit granting authority and therefore valid); *United States v. D'Annolfo,* 474 F.Supp. 220 (D.Mass.1979) (United States, on behalf of the Corps, obtained injunction pursuant to 33 U.S.C. secs. 1311, 1344, 1319 to restrain a developer from fill activities with regard to an area of rivers, ponds, lakes and wetlands); *United States v. Alleyne,* 454 F.Supp. 1164, 1170 (S.D.N.Y.1978) (under sections 1311 and 1344 "the Corps has jurisdiction 'not only to issue permits but to ... request or require applications for permits' ...") (brackets in original), *quoting Leslie Salt Co. v. Froehlke,* 403 F.Supp. 1292, 1297 (N.D.Cal.1974). Thus, although there is no explicit authority to do so, the Corps has investigated and helped to enforce permitless discharge violations and courts have acquiesced in their activities.

The legislative history of the Water Pollution Act makes clear that there was some difference of opinion as to the Corps' exact role in implementing this legislation. In fact, the record is replete with references to how power would be divided between the EPA and the Corps. Such division allocated to the Administrator of the EPA primary responsibility for the Act's implementation. 33 U.S.C. sec. 1251(d). However, the Corps was allowed to retain the power that it had been granted under the Rivers Act to issue permits for dredge and fill activities. 33 U.S.C. sec. 1344. The Administrator of the EPA was in 1972, and is today, responsible for issuing permits for all other pollutants. 33 U.S.C. sec. 1342(a).

This interpretation of the division of power is further supported by the various

---

33 U.S.C. sec. 1344(s)(4) discusses the civil penalties for violating a permit condition.

Although the statute does not give the Secretary of the Army explicit authority to bring an action for permitless discharges, it does give such authority to the Administrator of the EPA. 33 U.S.C. secs. 1311, 1319(a)(3). *See also* Comment, *Restoration of Wetlands Under Section 404 of the Clean Water Act: An Analytical Synthesis of Statutory and Case Law Principles,* 15 B.C.Envtl.Aff.L.Rev. 295, 309 n. 85 (1988) ("Thus the present enforcement scheme calls for the EPA to initiate actions against violators who by-pass the sec. 404 permit process altogether, and the ACOE [Army Corps of Engineers] to prosecute those who violate permit conditions or limitations ..."); McChesney, *Corps Recasts sec. 404 Permit Program, Braces for Political, Legal Skirmishes,* 13 Envtl.L.Rep. 10128, 10130 n. 29 (1983) (EPA "is responsible for enforcing the program by bringing suit against unpermitted dischargers." ... "The Secretary of the Army may bring civil actions for failure to comply with permit conditions 33 U.S.C. sec. 1344(s); but EPA may bring actions under sec. 309 33 U.S.C. sec. 1319 for discharging without a permit in violation of sec. 301 of the FWPCA." [footnote omitted] [citation omitted] ).

drafts of the Water Pollution Act. Senate Bill 2770, introduced by Senator Muskie on October 28, 1971, sought to amend the then-existing Federal Water Pollution Control Act. This bill gave the Administrator of the EPA total authority over the Water Pollution Act including the dredge and fill permit provisions. While considering the bill, Senate amendments were proposed to give authority to issue dredge and fill permits to the Secretary of the Army in light of the responsibilities given to the Secretary under the Rivers Act. *See* 117 Cong. Rec. S38853–54 (daily ed. Nov. 2, 1971) (proposal of Sen. Ellender). Senator Muskie, the moving force behind S. 2770, opposed those amendments. He felt that the Corps was not equipped to evaluate the environmental impact of dredging activities. *Id.* at S38854. In fact, he felt that the Corps was a "mission-oriented agency," *id.*, and "mission-oriented agencies whose mission is something other than concern for the environment simply do not adequately protect environmental values.... The mission of the Corps of Engineers is to protect navigation. Its mission is not to protect the environment." *Id.* at S38855. Despite Senator Muskie's arguments, the Senate added a new subsection 402(m) which read

> [a]ny application for a permit under this section for the discharge of dredged spoil into the navigable waters (other than in confined disposal sites) shall be accompanied by a certificate from the Secretary of the Army that the area chosen for disposal is the only reasonably available alternative and, unless the Administrator finds that the matter to be disposed of will adversely affect municipal water supplies, shellfish beds, wildlife, fisheries (including spawning and breeding areas) or recreation areas, such permit shall issue.

*Id.* at S38856–57.[5]

Meanwhile, the House amendment established a separate dredge and fill permit program to be administered solely by the Secretary of the Army. S.Conf.Rep. No.

1236, 92d Cong., 2d Sess. 324 (1972). The Conference substitute primarily adopted the House report giving the Corps the power to administer the dredge and fill permit program while authorizing the Administrator to

> .    .    .    .    .
>
> deny or restrict the use of any defined area for specification as a disposal site ... whenever he determines ... that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds, and fisheries areas ... wildlife, or recreational areas.

*Id.* at 324–25. The Conference report went on to state that:

> [f]ailure to obtain a permit under this section, or failure to comply with the requirements of such a permit would be a violation of section 301(a) and enforceable under section 309.

*Id.*

In the Senate Consideration of the Report of the Conference Committee on October 4, 1972, Senator Muskie, in explaining the Conference substitute, stated to his colleagues that, while the Corps retained regulatory authority as regards issuing permits, the Administrator still had three responsibilities under section 404. The first is the most relevant for our purposes: "the Administrator has both responsibility and authority for failure to obtain a Section 404 permit or comply with the condition thereon. Section 309 authority is available because discharge of the 'pollutant' dredge spoil without a permit or in violation of a permit would violate Section 301(a)." 118 Cong.Rec. S33699 (daily ed. Oct. 4, 1972) (statement of Sen. Muskie). Thus, it would seem that as of 1972 Congress intended the Administrator of the EPA, and not the Corps, to be the enforcement authority for permitless discharges.

The 1977 Amendments to the Water Pollution Act changed this scenario. New subsection (s), granting the Corps the pow-

---

5. Senator Muskie appears to have agreed to this amendment as a compromise measure. *Id.* at      S38856–57.

er to bring a civil action for violations of issued permits, was added to 33 U.S.C. sec. 1344. The Conference Report stated that "[n]ew subsection (s) of section 404 [33 U.S.C. sec. 1344] provides similar enforcement authority with respect to permits issued by the Secretary under section 404 [33 U.S.C. sec. 1344] as is provided to the Administrator in section 309 [33 U.S.C. 1319] of the Act with respect to permits issued under section 402 [33 U.S.C. sec. 1342] and 404 [33 U.S.C. sec. 1344] of the Act." H.R. Conf.Rep. No. 830, 95th Cong., 1st Sess. 103 (1977), U.S.Code Cong. & Admin. News 1977, p. 4478. Unfortunately, no mention was made of which agency had enforcement authority for permitless discharges.

As a result of the 1977 amendments to the Water Pollution Act, court decisions, and general attitude changes, the Corps promulgated revised regulations to implement 33 U.S.C. sec. 1344. Section 326 of these regulations, 33 C.F.R. sec. 326 (1987), prescribes the enforcement procedures applicable to activities performed both with (33 C.F.R. sec. 326.4 [1987] ) and *without* (33 C.F.R. sec. 326.3 [1987] ) an issued 1344 permit. Section 326.5(a) allows the District Engineer of the Army Corps of Engineers to "recommend civil or criminal actions to obtain penalties for violations, compliance with the orders and directives he has issued pursuant to sections 326.3 and 326.4 . . . ." Section 326.5(c), 33 C.F.R. sec. 326.5(c) (1987) goes on to say that with the limited exceptions outlined in section 326.5(d), the District Engineers are authorized to refer cases directly to the United States Attorney. Such regulations make clear that it was anticipated that the Corps would investigate, and refer to Justice for enforcement, cases involving permitless discharges.

It seems that these regulations evolved as a result of a series of Memoranda of Agreement among the Corps, EPA, and sometimes Justice. The more recent Mem-

oranda of Agreement between the Department of the Army and EPA make clear that, at least at this point in time, the EPA intends that in most cases the Corps will be the lead enforcement agency with regard to permitless discharges.[6] Memorandum of Agreement Between the Department of the Army and the Environmental Protection Agency Concerning Federal Enforcement for the Section 404 Program of the Clean Water Act (Jan. 19, 1989).

As early as 1976, EPA looked to the Corps as the primary enforcer of the Section 404 (33 U.S.C. sec. 1344) program. The June 1, 1976 memorandum from the EPA Assistant Administrator for Enforcement to the EPA Regional Administrators and Regional Enforcement Directors states that "[a] case may result in enforcement proceedings when referred by the Corps to the U.S. Attorney after consultation and coordination with EPA, or when referred by EPA should the Corps decide not to refer the case or when instituted by the Department of Justice on its own initiative." *Id.* at 3. This internal policy statement which was signed by EPA, Justice, and the Corps goes on to say that "[t]his policy is intended to promote legal compliance, to assure greater protection of our navigable waters and to create a reasonable and administratively workable enforcement procedure. I urge you to do your utmost to avoid duplication regarding section 404 matters which are to be handled on a first line basis by the United States Army Corps of Engineers." *Id.* at 5.

A May 26, 1980 Department of Army memorandum makes clear that the Corps believed that it had authority to stop the discharge of dredge and fill material into the waters of the United States without a section 404 permit. At the same time, the Corps recognized that "[c]onsultation with EPA at the local level is a must to assist in avoiding conflict." *Id.* at 2. Thus, be-

---

6. Note that although the Corps and EPA have agreed that the Corps will be the lead enforcement agency in this field, this agreement should not be viewed as a limitation of the EPA's authority to bring an enforcement action under 33 U.S.C. sec. 1319 for a violation of 33 U.S.C. sec.

1311. *See* 33 U.S.C. sec. 1344(n) and the September 11, 1980 Memorandum from R. Sarah Compton, EPA Deputy Assistant Administrator, to the EPA Enforcement Division Directors, at 3.

tween 1976 and 1980, EPA and the Corps shared responsibility for unpermitted discharges.

However, by October 1980 the Corps appeared uncertain of its authority to bring actions against permitless dischargers. At that time, the Corps proposed to EPA that it lacked such enforcement authority. Memorandum of EPA Acting Director, Enforcement Division to EPA Regional Enforcement Division Directors (Nov. 25, 1980) at 1. A November 25, 1980 memorandum raises the question of the Corps' authority, but does not answer it. *Id.* That memorandum directs EPA regional directors to take a "more positive approach to enforcement of section 404 … most particularly in cases of solid waste discharges requiring section 404 permits … and in cases where EPA asserts jurisdiction over waters of the United States, but the Corps disagrees." *Id.* at 2. EPA felt it necessary to undertake such enforcement action because, in certain situations, the Corps had been unwilling or reluctant to do so. *Id.* However, even at this point, EPA made it policy to notify the Corps of the proposed enforcement action both to afford the Corps the opportunity to join in the action and to ensure that the Corps did not take action that would be inconsistent with such enforcement. *Id.*

The waters are further muddied by a January 17, 1986 Memorandum of Agreement between EPA and the Corps which seems to imply that, while either agency may notify the unpermitted discharger of the prohibition of such discharges, it is the EPA that will "normally" issue an administrative order or file a complaint under section 309 [33 U.S.C. sec. 1319] to control the discharge. 51 Fed.Reg. 8,872, 8,872 (1986). Thus, there has been an ever-changing relationship between the Corps and EPA regarding the Corps' role in permitless discharge enforcement.

On January 19, 1989, the Corps and EPA reached an accord, manifested by three Memoranda of Agreement, whereby the Corps was given primary responsibility for the Section 404 program. The first discussed procedures regarding the applicability of previously issued Corps permits whereby the Corps is responsible for determining whether an alleged illegal discharge of dredge and fill material is authorized under an issued general or individual permit. Untitled Memorandum on Joint EPA and Department of Defense Letterhead (Jan. 19, 1989).

The second dealt with the determination of the geographic jurisdiction of the section 404 program and the application of the exemptions under section 404(f) of the Act. In spite of an opinion issued by the Attorney General of the United States to the Secretary of the Army on September 5, 1979,[7] holding that the Administrator of the EPA had the ultimate authority with respect to such issues, the 1989 memorandum stated:

> [i]t shall be the policy of the Army and the EPA for the Corps to continue to perform the majority of the geographic jurisdictional determinations of the applicability of the exemptions under section 404(f) as part of the Corps['] role in administering the section 404 regulatory program. It shall also be the policy of the Army and EPA that the Corps shall fully implement EPA guidance on determining the geographic extent of section 404 jurisdiction and applicability of the 404(f) exemptions.

Memorandum of Agreement Between the Department of the Army and the Environmental Protection Agency Concerning the Determination of the Geographic Jurisdiction of the Section 404 Program and the Application of the Exemptions Under Section 404(f) of the Clean Water Act (Jan. 19, 1989) at 1.

---

**7.** The Attorney General's opinion held that the ultimate authority under the Water Pollution Act to determine the reach of the term "navigable waters" for purposes of section 404 and the ultimate authority to determine the meaning of section 404(f) lay with the Administrator of the

EPA, and not the Corps. *Id.* at 6–7. Such opinion also held that "[e]nforcement authority over permitless discharges of dredged and fill material is charged, moreover, to the Administrator [of the EPA]." *Id.* at 6.

The third Memorandum of Agreement between the Corps and EPA signed on January 19, 1989 specifically addressed the issue of enforcement of the section 404 program. That memorandum states that its prime goal "is to strengthen the Section 404 enforcement program by using the expertise, resources and initiative of both agencies in a manner which is effective and efficient in achieving the goals of the [Water Pollution Act]." Memorandum of Agreement Between the Department of the Army and the Environmental Protection Agency Concerning Federal Enforcement for the Section 404 Program of the Clean Water Act (Jan. 19, 1989) at 1. To that end, the Corps was given responsibility to act as the lead enforcement agency in all cases regarding permitless discharges except when an unpermitted activity involves the following:

   a. Repeat Violator(s)

   b. Flagrant Violation(s)

   c. Where EPA requests a class of cases or a particular case; or

   d. The Corps recommends that an EPA administrative penalty action may be warranted.

*Id.* at 3–4.

The memorandum goes on to say that:

> [t]he lead enforcement agency shall determine, based on its authority, the appropriate enforcement response taking into consideration any views provided by the other agency. An appropriate enforcement response may include an administrative order, administrative penalty, complaint, a civil or criminal judicial referral or other appropriate formal enforcement response.

*Id.* at 4.

■ Thus, the EPA at present has delegated to the Corps, pursuant to the procedures and guidelines outlined in the January 19, 1989 Memorandum, the authority to investigate and refer permitless discharge cases under section 404 to Justice for enforcement. By delegating such enforcement authority, EPA, of course, did not expand the Corps' power under 33 U.S.C. sec. 1344; the legislative history and the Attorney General's opinion of September 5, 1979 reveal that such power lies squarely with EPA. Rather, the power delegated to the Corps by EPA derives directly from EPA's authority under 33 U.S.C. sec. 1311 and 33 U.S.C. sec. 1319. Such delegation is not statutory and may be revoked by the EPA at any time. Further, such delegation is limited to the terms set out in the third Memorandum of Agreement between the Corps and EPA dated January 19, 1989. Such delegation does not run afoul of any Congressional policy underlying the relevant statutes; indeed, it seems to be in line with the purpose and objective of the Water Pollution Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. sec. 1251(a), and Congress' explicit intent that "to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available [personnel] and funds, so as to prevent needless duplication and unnecessary delays at all levels of government." 33 U.S.C. sec. 1251(f).

In light of the foregoing, the Court hereby concludes that the Defendant's Motion for Summary Judgment must be DENIED.