**UNITED STATES of America, Plaintiff,**

v.

**HALLMARK CONSTRUCTION COMPANY, Defendant.**

No. 97 C 3682.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 10, 1998.

---

Christopher Eric Tracy, U.S. Attorney's Office, Chicago, IL, for U.S.

Johnine J. Brown, Sheila H. Deely, The Brown Environmental Law Group, P.C., Chicago, IL, Maureen Martin, Martin Law Firm, Chicago, IL, Julie Dana Melvin, The Brown Environmental Law Group, P.C., Chicago, IL, for Hallmark Const. Co.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

The United States of America sues Hallmark Construction Company ("Hallmark") for allegedly filling a five-acre isolated wetland ("Area B") without obtaining a permit under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344. The government seeks restoration of Area B and/or mitigation to address the loss of wetland area. On July 23, 1998, the court granted summary judgment in part because the United States was not a proper plaintiff. The United States moves for reconsideration of the July 23 judgment.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Hallmark is an Illinois corporation in the business of developing property. Def. 12(M) ¶ 2. In 1988, Hallmark purchased the former Swift Research Farm in Frankfort, Illinois and began developing the Heritage Knolls subdivision. Id. ¶ 26.

Area B was a natural topographical depression in the middle of the farm. Id. ¶¶ 2, 11. The farm contained underground clay tiles for drainage. The parties dispute the extent to which the underground tiles successfully drained Area B in the years before development. See, e.g., Def. 12(M) and Pl. 12(N) ¶¶ 8, 13, 14, 15, 19. The United States points to historical aerial photographs as evidence of inundation and saturation in Area B. John Kestel, the person who farmed the land purchased by Hallmark, states that Area B was never ponded over for more than four consecutive days. Hallmark points to computer modeling evidence suggesting that Area B could not have been inundated for 15 or more consecutive days during the growing season. Def. 12(M) ¶ 65.

Hallmark did not begin development in Area B until 1989. Def. 12(M) ¶ 27. The parties dispute whether Area B provided substantial habitat, nesting, feeding, or other value to migratory birds different from that provided by the surrounding farm fields. See Def. 12(M) and Pl. 12(N) ¶ 25. But it is undisputed that John Kestel saw geese in his fields, including Area B. Today, Area B contains an artificial five-acre stormwater detention/retention pond, roads, and several homes. Def. 12(M) ¶ 40. Although the present stormwater detention area stores more water than Area B stored prior to development, the parties dispute whether the quality of the water has improved and whether it provides a better or worse habitat for migratory birds. Id. ¶ 46; Pl. 12(N) ¶¶ 24–25, 46.

In 1990—after development began—Hallmark's civil engineer recommended that Hallmark hire Planning Resources, Inc. to

inspect Heritage Knolls for the presence of wetlands. *Id.* ¶ 28. Planning Resources inspected Heritage Knolls in accordance with the 1989 Federal Manual For Identifying and Delineating Jurisdictional Wetlands ("1989 Manual") and prepared a report.[1] *Id.* ¶ 29. Although other areas of the farm had standing water during the inspection, Area B was neither saturated nor inundated. *Id.* ¶ 32.[2] Nonetheless, Planning Resources concluded Area B was a "seasonally flooded farmed wetland" based on the presence of a flotsam ring (or drift lines), hydrophytic vegetation, and hydric soils. Pl. 12(N) ¶¶ 34, 35. A flotsam ring is created by dead or drowned vegetative debris deposited in a circular pattern where temporary inundation has occurred and receded.

In August 1990, Hallmark submitted Planning Resources' report to the United States Army Corps of Engineers ("the Corps"). *Id.* ¶ 29. The Corps requested that Hallmark fill out an "after-the-fact" permit application and provide a mitigation plan to address the loss of wetland area. Over the course of more than five years, the Corps repeatedly requested (and eventually demanded) that Hallmark provide an adequate mitigation plan. In April 1994, Hallmark retained SDI Consultants, Ltd. ("SDI") to write a proposal for a mitigation plan. *Id.* ¶ 53. SDI reviewed all available historical data about Area B and concluded that it had not been a farmed wetland after all. SDI concluded development of Area B did not require mitigation because it was "prior converted cropland" lacking wetland hydrology. *Id.* ¶ 56.

The Corps asked the National Resources Conservation Service ("the Conservation Service") to determine whether wetlands previously existed on Heritage Knolls. The Conservation Service's wetland map, prepared in 1987 or 1988, designates approximately five acres of Area B as wetland. The Conservation Service makes wetland determinations based on examination of aerial photographs and other historical data. Def. 12(M) ¶ 61; Pl. 12(N) ¶ 61. The parties dispute whether aerial photographs from 1964, 1970, 1976 and 1980 and crop compliance photographs from 1980, 1982, 1984, 1986 and 1988 show evidence of inundation of Area B. *Id.* ¶ 64.

After attempts to resolve the dispute proved unsuccessful, the Corps referred the matter to the United States Attorney; this suit was filed in May 1997. The Corps never consulted with the Environmental Protection Agency regarding Area B or its decision to refer this case the United States Attorney for civil enforcement. *Id.* ¶ 67.

## DISCUSSION

 Motions for reconsideration serve a limited purpose. On reconsideration, a party may not introduce new evidence or legal theories that could have been presented earlier. *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269 (7th Cir.1996). Nevertheless, a motion to reconsider may be proper to correct manifest errors of law or to present newly discovered evidence. *In the Matter of Prince*, 85 F.3d 314, 324 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996). Ultimately, a district court may grant a motion to reconsider so long as the court does not abuse its discretion. *Id.*

The court determines this motion on an argument raised by the United States in its summary judgment response. As Hallmark concedes, the United States' motion for reconsideration "reiterates its argument that the Corps really does have CWA authority for permitless discharges." Mem. at 3. The United States' reiteration and clarification of its prior argument does not constitute a new legal theory. Moreover, upon reconsideration of the argument, the court recognizes an error of law in its prior order. Thus, this motion is properly before the court.[3]

---

1. The 1989 Manual was rescinded in 1991. When the 1989 Manual was rescinded, the 1987 Corps of Engineers Wetlands Delineation Manual ("1987 Manual") was retroactively reinstated for the time period at issue in this case.

2. The United States argues the lack of saturation or inundation in Area B may be explained by the fact construction was underway by the time Planning Resources visited the site, including grading for roads and utility crossings and the

possible placement of a storm sewer near Area B. *See* Pl. 12(N) ¶ 32.

3. The United States also raises an argument concerning the Attorney General's plenary authority to bring suit pursuant to 28 U.S.C. §§ 516 and 519. Whether or not this argument constitutes a legal theory not raised previously in its summary judgment response is irrelevant because the

■ In its July 23, 1998 summary judgment order, this court found the United States was not a proper party plaintiff because the Corps had no authority under section 404 of the CWA to commence a civil action for a permitless discharge. The court further found the Environmental Protection Agency's delegation of this authority to the Corps unconstitutional because only Congress could delegate this enforcement authority. Upon reconsideration of section 404 and the governing case law, the court reconsiders its prior position. Section 404 does grant the Corps authority for enforcement of permitless discharges, making the United States a proper party plaintiff.

Section 404(s)(3) sets forth the circumstances for which the Corps has enforcement authority:

> The Secretary [of the Corps] is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction for any violation for which he is authorized to issue a compliance order under paragraph (1) of this subsection.

33 U.S.C. § 1344(s)(3). Important here is the language granting the Corps enforcement authority "for any violation for which [it] is authorized to issue a compliance order." *Id.* Paragraph (1) articulates when the Corps may issue a compliance order. It states as follows:

> Whenever on the basis of any information available to him the Secretary finds that any person is in violation of any condition or limitation set forth in a permit issued by the Secretary under this section, the Secretary shall issue an order requiring such person to comply with such condition or limitation, or the Secretary shall bring a civil action in accordance with paragraph (3) of this subsection.

33 U.S.C. § 1344(s)(1). Clearly, the Corps can issue a compliance order for a permit violation. However, this may not be the only instance in which it can issue a compliance order. If section 404(s)(1) allows the Corps to issue a compliance order for permitless discharges, then section 404(s)(3) grants the Corps authority to bring civil actions for permitless discharges.

In the CWA, Congress allowed the Corps "to retain the power that it had been granted under the Rivers Act to issue permits for dredge and fill activities." *United States v. Kelcourse,* 721 F.Supp. 1472, 1474 (D.Mass. 1989); *see also* H.R.Conf.Rep. No. 830, 95th Cong., 1st Sess. 103 (1977), U.S.C.C.A.N. 1977, p. 4478. This power stands in juxtaposition to the authority over permits for all other pollutants, which lies with the EPA. 33 U.S.C. § 1342(a). A permit involves the giving of consent, permission, or authorization. *See* Webster's II New Riverside University Dictionary (1984). The power to permit necessarily implies control of the underlying substance requiring permitted activity. Section 404 regulates dredged or fill material discharged into navigable waters at specified disposal sites. 33 U.S.C. § 1344(a). Thus, section 404 grants the Corps control and authority over dredged or fill material discharged into navigable waters. Although this authority is most often exercised in the form of a permit consenting to and setting guidelines for the discharge, it may be exercised in other ways. For instance, the Corps has the power under section 404(s)(1) to issue cease and desist orders regarding unauthorized activity in areas under its control. 33 C.F.R. Section 209.120(g)(12)(i); *see also United States v. Alleyne,* 454 F.Supp. 1164 (S.D.N.Y.1978). This power stems from the Corps' general control over fill discharge into navigable waters. 33 U.S.C. § 1344(a). The Corps' authority over this activity is not compromised because the discharging party does not first seek a permit. If the Corps has permit control over wetland areas to ensure their protection, it most certainly has the power to stop unlawful permitless activity that endangers navigable waters. The authority to issue cease and desist orders is inherent in its control of discharge into navigable waters.

Courts considering the extent of the Corps' authority under section 404 have concluded the permitting power includes the power to require permits for discharge activity and to issue cease and desist orders for permitless discharges. "[R]egulations giving the COE [Corps] authority to order people to cease

court need not reach this argument in making its decision.

and desist from further filling in the absence of a permit and which also authorize the COE to order the removal of such fill when it has been placed in contravention of 33 U.S.C. § 1311 are reasonably related to the COE's permit granting authority." *Parkview Corp. v. Dep't of the Army, Corps of Engineers,* 490 F.Supp. 1278, 1285 (E.D.Wis.1980); *see also Alleyne,* 454 F.Supp. at 1167. Similarly, the jurisdiction to issue permits includes the authority "to assert that jurisdiction by requesting or requiring applications for permits for any discharge of dredged or fill material into navigable waters of the United States." *Leslie Salt Co. v. Froehlke,* 403 F.Supp. 1292, 1297 (N.D.Cal.1974).

As stated above, the authority to issue a compliance order pursuant to section 404(s)(1) dictates a comparable authority to bring enforcement actions pursuant to 404(s)(3) for violations of those orders. Because the Corps has the authority both to require permits for areas under its control and to issue cease and desist orders for permitless activity in these areas, it has the authority to bring civil actions for permitless discharges. This decision does not rest on the EPA's delegation of permitless discharge enforcement authority to the Corps; therefore, the court need not re-address the appropriateness or constitutionality of delegation. Rather, this conclusion is based upon a plain reading of section 404.[4] In section 404, Congress gave the Corps responsibility for the protection of wetland areas and navigable waters. This responsibility necessarily carries with it the authority to stop activity that endangers or pollutes the areas in question.

After Hallmark allegedly began filling a wetland controlled by the Corps pursuant to section 404, the Corps requested an "after-the-fact" permit application and mitigation plan to address the loss of the wetland area. The Corps repeated this demand over the course of more than five years. When attempts to resolve the dispute proved unsuccessful, the Corps referred the matter to the United States Attorney. Because Congress has charged the Corps with protecting the wetlands and navigable waters of the United States, the Corps has the authority to address unlawful discharges into these areas. 33 U.S.C. § 1344. The Corps properly referred the matter to the United States Attorney. 33 C.F.R. § 326.5(c). Accordingly, the United States is a proper plaintiff in this action.

## CONCLUSION

The United States' motion to alter or amend judgment is granted. The memorandum opinion and order of July 23, 1998 is vacated.

---

4. To the extent the court uses administrative regulations as support for its decision, the agency's regulations constitute a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Parkview,* 490 F.Supp. at 1284. *Parkview* was decided before *Chevron;* however, in reaching its decision, the *Parkview* court engaged in the *Chevron* analysis.